IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 09-cv-1576-WDM-KLM

WILDEARTH GUARDIANS,

    Plaintiff

v.

PUBLIC SERVICE COMPANY OF COLORADO, d/b/a XCEL ENERGY

    Defendant.

## ORDER ON MOTION TO DISMISS

Miller, J.

This case is before me on the Motion to Dismiss (Doc. No. 7) filed by Defendant Public Service Company of Colorado d/b/a Xcel Energy ("Xcel"). Plaintiff WildEarth Guardians ("WildEarth") opposes the motion. For the reasons that follow the motion is granted in part and denied in part.

### BACKGROUND

This is a case arising under the Clean Air Act section 112(g) (42 U.S.C. § 7412(g)). Xcel contends that this Court should dismiss WildEarth's claims for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) as an impermissible collateral attack on existing state proceedings. Alternatively, Xcel contends that this Court should abstain from exercising jurisdiction under the *Burford* doctrine and dismiss the case under Fed. R. Civ. P. 12(b)(6). Finally, Xcel asserts that reinstituting of federal mercury regulations may not be applied retroactively to render Xcel's actions unlawful.

Plaintiff WildEarth is a non-profit corporation with approximately 4,000 members throughout the United States, including Colorado. Compl. ¶ 10. Its mission is "to bring people, science, and the law together in defense of the American West's rivers, forests, deserts, grasslands, and the delicate web of life to which we are inextricably linked." *Id.*

In 2005, the Colorado Public Utilities Commission ("PUC") granted Xcel a permit to build a 750 megawatt coal-fired electric generating plant at the Comanche Station, known as Comanche Unit 3 ("Comanche 3"). By this action, WildEarth seeks a declaratory judgment that the construction is illegal and to enjoin its construction and operation, claiming that Xcel unlawfully failed to obtain a MACT emission limitation determination for mercury emissions, pursuant to Section 112(g) of the CAA, 42 U.S.C. 7412(g), prior to beginning construction. WildEarth also asks that Xcel be assessed penalties and ordered to pay WildEarth's costs and attorneys' fees. WildEarth's Motion for Temporary Restraining Order was denied.

<u>History of MACT Requirement for Mercury Emissions</u>

Under the CAA, the EPA is required to list categories of sources that emit hazardous air pollutants ("HAPs"). *See* 42 U.S.C. § 7412(c). One such category is "major sources" of HAPS, defined as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any [HAP] or 25 tons per year or more of any combination of [HAPs]." *Id.* at § 7412(a)(1).

In 2000, the EPA Administrator determined that regulation of electric utility steam generating units ("EGUs") was appropriate under Section 112 of the CAA because

2

EGUs emit HAPs, including mercury, which "is a public health concern and a concern in the environment." 65 Fed. Reg. at 79,830. In 2002, EGUs were added to the list of source categories of HAPs under Section 112 of the CAA. National Emission Standards for Hazardous Air Pollutants: Revision of Source Category List Under Section 112 of the Clean Air Act, 67 Fed. Reg. 6521, 6522, 6524 (Feb. 12, 2002).

In 2005, the EPA published a rule removing EGUs from regulation under section 112 ("Delisting Rule"), Revision of December 2000 Regulatory Finding on the Emissions of Hazardous Air Pollutants from Electric Utility Steam Generating Units and the Removal of Coal- and Oil-Fired Electric Utility Steam Generating Units from the Section 112(c) List; Final Rule, 70 Fed. Reg. 15,994, 16,002-08, 16,032 (March 29, 2005) (codified at 40 C.F.R. pt. 63), and published the Clean Air Mercury Rule ("CAMR"), which regulated HAPs from EGUs under section 111 of the CAA rather than section 112. Standards of Performance for New and Existing Stationary Sources: Electric Utility Steam Generating Units; Final Rule, 70 Fed. Reg. 28,606, 28,608, 28624-32 (May 18, 2005) (codified at 40 C.F.R. pts. 60, 72, and 75).

On February 8, 2008, the United States Court of Appeals for the District of Columbia Circuit determined that the EPA's 2005 decision to remove EGUs from regulation under Section 112 was inappropriate because the EPA failed to follow the specific delisting process set forth in the Section 112(c)(9) and struck down CAMR and held that the EPA delisting of mercury had never occurred. *New Jersey v. EPA*, 517 F.3d 574, 581-83 (D.C. Cir. 2008).

The EPA has accepted the result of the *New Jersey* case and considered the Delisting Rule to have been vacated effective March 14, 2008, the date the Court of

Appeals issued its mandate.

On January 7, 2009 the EPA sent a letter to its Regional Administrators stating that the Agency believed that EGUs that were under construction or reconstruction between March 29, 2005, the delisting date, and March 14, 2008, the mandate date, "are legally obligated to come into compliance with the requirements of Section 112(g)." January 7, 2009 letter from EPA Office of Air and Radiation to Regional Administrators attached as Ex. L to Brief in Support of Motion to Dismiss (Doc. No. 8-13) (hereinafter "Brief"). The EPA requested that "the appropriate State or local permitting authority commence a process under Section 112(g) to make a new-source MACT determination in each of these cases." *Id.* In the letter, the EPA recognized that the application of MACT standards to a project, which had already begun construction, might present challenges and that consideration of MACT requirements that may have been foreclosed by construction should be given for construction activities that took place prior to February 8, 2008. *See id.* ("[I]t is reasonable for the permitting authority—under these unique and compelling circumstances, and within the bounds of its discretion under . . . Section 112(g) regulations—to give consideration to the effect of prior construction, undertaken in reasonable reliance on now-vacated rules in making the case-by-case determination of applicable MACT requirements." *Id.* at 2).

<u>History of Xcel's Application for Comanche Unit No. 3 Permit</u>

Xcel initially sought permission to construct Comanche 3 from the Colorado Public Utilities Commission ("PUC"). A coalition of conservation groups and civic organizations resisted Xcel's application.

In August, 2004, while PUC approval was pending, Xcel made its initial application for a permit to construct Comanche 3 from the Colorado Department of Public Health and Environment ("CDPHE"), Air Pollution Control Division ("APCD") pursuant to Colorado law and the CAA. Since it antedated the Delisting Rule, this application included a case-by-case MACT determination at $20 \times 10^{-6}$ lbs/MWhr on a twelve-month rolling average.

Thereafter, in December of 2004, Xcel made a settlement with the objecting parties before the PUC, which obligated Xcel to minimally meet the above MACT emissions limit for not only the proposed Comanche 3 but also the two other existing Comanche units which previously had no such limitations. ("Settlement") Brief, Ex. D at 5-7. Thereafter, the PUC approved Xcel's revised plan in 2005.

On January 18, 2005, Xcel amended its application pending before the APCD to include the terms of the Settlement. Brief, Ex. E.

On March 2, 2005, APCD released an initial draft of permit analysis for Comanche 3 which included APCD's specific determination that Xcel's proposed mercury limitations constituted a case-by-case MACT. Brief, Ex. B at 16-18.

Before the permit issued, however, the EPA adopted the Delisting Rule as noted above, applying CAMR in lieu of the MACT.

In June 2005, APCD held public hearings and received comments. WildEarth did not participate or make any comments.

APCD revised its initial approval and issued a final permit for Comanche 3 on July 5, 2005. The permit acknowledged that Xcel's applications had included the case-by-case MACT analysis but that it was removed because of the EPA Delisting Rule.

5

APCD Revised Approval at 24.  Instead, the final permit required compliance with CAMR.  Final Permit at 8.  Nevertheless, limitations on mercury emission limits determined to be MACT remained in the final permit as required by the Settlement.

After the issuance of the permit a citizen's group, not including WildEarth, filed suit against APCD in District Court for Pueblo County, Colorado for having issued the permit, making various claims unrelated to MACT.  The District Court rejected the challenges and was affirmed by the Colorado Court of Appeals.  A request for *certiorari* was denied.  *Citizens for Clean Air & Water in Pueblo & S. Colo. v. Colo. Dep't of Pub. Health & Env't, Air Pollution Control Div.,* 183 P.3d 393 (Colo. App. 2008)*, cert. denied* 2008 WL2581591 (Colo. 2008).

In accordance with the APCD permit, construction of Comanche 3 commenced in October 2005, and has continued without interruption.  It is undisputed that the unit nears completion.

On January 7, 2009, consistent with the *New Jersey* decision, EPA concluded that electric utilities which were permitted during the delisting period between March 19, 2005, and the *New Jersey* vacation of the rule, are now obligated to comply with Section 112(g).  *See* Brief*,* Ex. L.  January 7, 2009 EPA letter to Regional Administrators.  As a consequence, on March 13, 2009, CDPHE sent a letter to Xcel noting that it had been requested to make a MACT determination.  Specifically, CDPHE stated: "Since a complete 112(g) determination was submitted with the Comanche Unit 3 permit application in August, 2004, the Division is requesting that you supplement and revise your initial 112(g) determination, if necessary, to include any available information regarding control technologies and emission rates since the submittal of

your initial determination." Brief, Ex. M.

In April, 2009, WildEarth sent Xcel Plaintiff's sixty-day notice of intent to sue because of noncompliance with Section 112(g).

On July 2, 2009, WildEarth filed its complaint.

On July 17, 2009, the EPA also notified Xcel that it considered Section 112(g) applicable, stating: "You must contact the appropriate permitting authority as expeditiously as possible to obtain a new source maximum achievable control technology (MACT) determination and a schedule for coming into compliance with the requirements of Section 112(g)." Brief, Ex. N.

I note that neither the EPA nor APCD, both aware of Xcel's on-going construction, ordered Xcel to stop construction pending the MACT analysis and determination.

On July 24, 2009, Xcel submitted its MACT update with a twelve-month moving average of $15 \times 10^{-6}$ lbs/MWhr.

It is undisputed that Xcel began burning coal in the Comanche 3 boilers in the fall of 2009.

In December 2009, the APCD published a revised permit with MACT at that level. Following the period for public comment, the final revised permit was issued on February 22, 2010, with the MACT formula of $14.7 \times 10^{-6}$ lbs/MWhr. Ex. A to Defendant's Unopposed Motion to Supplement Record (Doc. No. 60). There is no indication that ongoing construction of Comanche 3 is not in accordance with the APCD approved MACT determination.

In sum, this chronology demonstrates that, had the EPA not delisted the electric

utilities from Section 112(g), the original permit would quite likely have a MACT limit of 20 x 10$^{-6}$ lbs/MWhr as a twelve-month average, as well as the other obligations undertaken in keeping with the PUC Settlement applicable to all of its Comanche generating units. Once the delisting was annulled, Xcel presented a revised case-by-case MACT determination constituting an approximate 25% reduction in permitted emissions of mercury. As a consequence, the final permit has a greater limitation on mercury emissions than Xcel's original permit would have allowed had the Delisting Rule never been adopted.

## STANDARD OF REVIEW

Xcel seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for failure to state a claim upon which relief can be granted because the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1960 (2007). Factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* The court must accept as true all well-pleaded facts and construe all reasonable allegations in the light most favorable to the plaintiff. *United States v. Colo. Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996).

"[A] court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case," which occurs when "subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.

1995). Under the CAA, subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case, thereby requiring treatment of a Rule 12(b)(1) motion as a Rule 12(b)(6) motion or a Rule 56 summary judgment motion. "[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. . . . This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record. " *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (citing *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000)). The documents may only be considered to show their contents, not to prove the truth of matters asserted therein." *Id.* (quoting *Oxford Asset Mgmt.*, *Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)). I take judicial notice of records and facts which are a matter of public record in considering this motion, including the February 19, 2010 CDPHE letter to WildEarth responding to the group's comments on the new permit.

## DISCUSSION

### Subject Matter Jurisdiction

I begin by addressing Xcel's argument that I lack subject matter jurisdiction over this matter. WildEarth alleges that Xcel has violated the CAA § 112(g)(2)(B) in constructing Comanche 3 without having first made a MACT determination (Compl. ¶¶ 31-34) or, in the alternative, has violated the CAA § 112(g)(2)(A) in modifying the Comanche Station without first obtaining a MACT determination. Compl. ¶¶ 35-37. Xcel contends that, because it obtained a validly issued permit from APCD in 2005, when a MACT determination was not required under CAA § 112(g), WildEarth's claims

9

are a challenge to the 2005 permit and an impermissible collateral attack over which I lack jurisdiction. Xcel further contends that the invalidation of the federal mercury regulations may not be applied retroactively to require Xcel to obtain a MACT determination under current standards.

WildEarth does not complain that the 2005 permit was invalid. WildEarth has alleged an adequate factual basis for its claims challenging Xcel's current compliance with the CAA in not having obtained a MACT determination despite the 2008 vacatur of the EPA's delisting of mercury. WildEarth's complaint raises federal questions under the CAA. Whether Xcel has sufficiently met the MACT standard pursuant to § 112, is a question of law and fact to be determined at a later time. From the non-conclusory facts alleged, however, WildEarth's assertions that Xcel has violated the CAA § 112 are plausible and not speculative.

Construing all reasonable allegations in the light most favorable to the plaintiff, I conclude that, pursuant to 28 U.S.C. § 1331, I have subject matter jurisdiction. The principle remaining issues are abstention and retroactivity.

## Abstention

As time passed and construction progressed, Xcel submitted its MACT analysis to APCD which it determined, with some modification, to be an appropriate MACT. WildEarth participated in the permitting process and procedures that exist for it to obtain review; including, if appropriate, judicial relief through the state system. *See* Colo. Rev. Stat. § 24-4-106; § 25-7-114 *et seq.*; *see also, e.g., Citizens for Clean Air & Water in Pueblo and S. Colo. v. Colo. Dep't of Pub. Health and Env't, Air Pollution Control Div.*, 181 P.3d 393 (Colo. App. 2008) (affirming issuance by APCD of construction permits for

Comanche 3). Indeed, at oral argument on the motion to dismiss, WildEarth's counsel acknowledged that its request for injunctive relief had essentially been rendered moot by the APCD MACT determination.

In this circumstance, any further review of the permit in the future is a matter from which this court should abstain under the *Burford* doctrine. "Federal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with the principles of comity and federalism." *Burford v. Sun Oil*, 319 U.S. 315, 332-33 (1943). Colorado has a comprehensive review process that allows all issues to be properly addressed and reviewed. Sitting in equity on the facts of this case, I should decline to interfere with the State of Colorado's on-going administrative and potential judicial review processes. *New Orleans Pub. Serv. Inc. v. Counsel of New Orleans*, 491 U.S. 350, 361 (1989). Concurrent review by an inexpert federal court could be disruptive of Colorado's efforts to establish a coherent policy concerning emissions of pollutants from power plants. Accordingly, I conclude that I should abstain from any further review of the ongoing permit process for Comanche 3.

Retroactivity

As opposed to its acquiescence that injunctive relief is no longer required, WildEarth is adamant that Xcel's continued construction without an approved MACT determination after the *New Jersey* decision was a continuing violation under Section 112 from commencement until the MACT determination, thereby exposing Xcel to civil penalties and liability for WildEarth's costs and attorneys' fees. Accordingly, Defendant's defense of impermissible retroactivity, a difficult issue, needs to be addressed.

11

"Courts are understood only to find the law, not to make it." *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 535-36 (1991); *see also*, *Harper v. Va. Dept. of Taxation*, 509 U.S. 86, 107 (1993) ("'[T]he province and duty of the judicial department is to say what the law is,' . . . not what the law shall be." *Id.* (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803))). "Judicial declaration of law is merely a statement of what the law has always been. 'For if it be found that [a] former decision is manifestly absurd or unjust, it is declared, not that such a sentence was bad law, but that it was not law.'" *Cash v. Califano*, 621 F.2d 626, 628 (4th Cir. 1980) (quoting 1 Blackstone, *Commentaries on the Law of England* 70 (1765)). Therefore, if nothing else, and as determined by the *New Jersey* court, one could conclude that Xcel always was required to have a MACT determination regardless of the Delisting Rule. *See New Jersey* at 583.

The exception to this rule under *Harper v. Va. Dept. of Taxation* is that a court ruling is not applied retroactively to cases which are no longer subject to direct review, *i.e.* a final judgment. *Id.* at 97. Given that Xcel's original permit without a MACT determination was subject to final review up through denial of *certiorari*, Xcel argues that the *New Jersey* decision does not apply to its initial permit. However, Xcel did not elect to stand on its original permit and insist on the basis of the *Harper* exception that it need not do a MACT analysis. Instead, in response to a March, 2009 request from CDPHE that a MACT determination be undertaken, Xcel complied , arguably reopening the permit issues and making them subject to review and, therefore, to the *New Jersey* rule. With this construct, Xcel's continuing construction after CDPHE's request was then a violation of Section 112(g) because a MACT had not been determined.

12

If one proceeds with an assumed violation of Section 112(g) because of the reopening of the permit process, the question becomes whether Xcel should be subject to the requested penalties and fees and cost award for WildEarth.

I note that the parties have only superficially addressed the issues of whether review of the original permit was reopened and whether penalties and costs should be awarded by myself sitting in equity. I will be better served by specific briefing on these issues.

Accordingly it is ordered:

1. Xcel's motion to dismiss (Doc. No. 7) is granted in part and denied in part;

2. This court shall abstain from any further review of the CDPHE permit for all matters occurring subsequent to the issuance of the permit on February 22, 2010;

3. Xcel's Motion to Dismiss on the basis of retroactivity is dismissed without prejudice; and

4. The parties shall submit briefs on the issues of whether Xcel should be penalized were I to conclude that it had violated Section 112(g) for its construction activities prior to the issuance of the revised permit as follows:

> a. On or before April 5, 2010, WildEarth shall file a brief, no longer than twenty pages, addressing whether the *Harper* exception applies and, if not, whether Xcel should be penalized and WildEarth awarded its costs and attorneys' fees;
>
> b. Xcel shall file its response brief, no longer than twenty pages, on or before April 26, 2010; and

13

    c. WildEarth may file a reply brief, not to exceed ten pages, on or before May 6, 2010.

DATED at Denver, Colorado on March 9, 2010

                                        BY THE COURT:

                                        Walker D. Miller
                                        United States Senior District Judge